Slip Op. 18–111

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHANGHAI SUNBEAUTY TRADING CO., LTD., | : |
| Plaintiff, | : |
| v. | : |
| UNITED STATES, | : |
| Defendant, | : |
| and | : |
| AMERICAN HONEY PRODUCERS ASSOCIATION, *et al.*, | : |
| Defendant-Intervenors. | : |

Court No. 17-00089

Before: Richard K. Eaton, Judge

**PUBLIC VERSION**

## **OPINION**

[United States Department of Commerce's final rescission determination is sustained.]

Dated:  September 6, 2018

*Fei He*, Law Offices of He & Associates, P.C., of Irvine, CA, argued for plaintiff.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were *Chad A. Readler*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of Counsel on the brief was *Nanda Srikantaiah*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Michael J. Coursey*, Kelley Drye & Warren LLP, of Washington, DC, argued for defendant-intervenors. With him on the brief were *R. Alan Luberda* and *Joshua R. Morey*.

Eaton, Judge: Before the court is the motion for judgment on the agency record of plaintiff Shanghai Sunbeauty Trading Co., Ltd. ("plaintiff" or "Sunbeauty"), an exporter of

honey from the People's Republic of China. *See* Pl.'s Br. Supp. Mot. J. Agency R., ECF No. 27

("Pl.'s Br."); *see also* Pl.'s Reply Br. Supp. Mot. J. Agency R., ECF No. 36 ("Pl.'s Reply Br.").

By its motion, Sunbeauty challenges the United States Department of Commerce's (the

"Department" or "Commerce") rescission of the new shipper review of its honey sales to the

United States during the period of review of December 1, 2014, to November 30, 2015 ("POR").

*See Honey From the People's Rep. of China*, 82 Fed. Reg. 15,697 (Dep't Commerce Mar. 30,

2017) (final rescission of the new shipper rev.), and accompanying Issues and Dec. Mem., P.R.

150, bar code 3554991-01, ECF No. 38 at tab 2 ("Final I&D Memo") (collectively, "Final

Rescission Determination").[1] Plaintiff contests the Department's determination that Sunbeauty's

sales to its U.S. importer were not *bona fide*.[2] Sunbeauty therefore asks the court to remand this

matter to Commerce with instructions to calculate a dumping margin for its products. *See* Pl.'s

Mot. J. Agency R., ECF No. 26.

The defendant United States ("defendant" or the "Government"), on behalf of

Commerce, and defendant-intervenors American Honey Producers Association and Sioux Honey

Association, urge the court to sustain the Final Rescission Determination as supported by

substantial evidence and otherwise in accordance with law. *See* Def.'s Resp. Pl.'s Mot. J. Agency

---

[1]      Though the Final Rescission Determination is on the public record ("P.R."),
Commerce's *bona fides* analysis is contained primarily in two confidential memoranda, the Bona
Fides Analysis Memorandum and the Business Proprietary Information Memorandum. *See* Bona
Fides Analysis of Honey from the People's Rep. of China for Sunbeauty (Nov. 30, 2016), C.R.
67, ECF No. 38 at tab 6 ("*Bona Fides* Memo"); Business Proprietary Information Mem. for
Sunbeauty (Mar. 24, 2017), C.R. 73, ECF No. 38 at tab 3. Where the court refers to information
from the confidential record ("C.R."), it appears in double brackets.

[2]      Sunbeauty made [[      ]] sales of [[                    ]] honey during the POR. It
is with respect to these sales that Commerce made its *bona fides* determination. *See Bona Fides*
Memo at 2, 6.

R., ECF No. 32 ("Def.'s Br."); *see also* Def.-Ints.' Opp'n Pl.'s Mot. J. Agency R., ECF No. 34

("Def.-Ints.' Br.").

The court has jurisdiction under 28 U.S.C. § 1581(c) (2012), and, for the following

reasons, sustains Commerce's Final Rescission Determination.


## BACKGROUND

Imports of honey from China have been subject to an antidumping duty order since 2001.

*See Honey From the People's Rep. of China*, 66 Fed. Reg. 63,670, 63,671 (Dep't Commerce

Dec. 10, 2001). On December 17, 2015, Sunbeauty asked Commerce to conduct a new shipper

review of its honey sales during the POR. *See* Letter to the Sec'y from Sunbeauty (Dec. 17,

2015), C.R. 1, ECF No. 38 at tab 12. Through this review, Sunbeauty sought an individual

dumping margin.

On January 27, 2016, Commerce initiated the new shipper review and thereafter

requested sales and other information from Sunbeauty and its U.S. importer[3] by way of

questionnaires. *See Honey From the People's Rep. of China*, 81 Fed. Reg. 5710 (Dep't

Commerce Feb. 3, 2016); *see also* Bona Fides Analysis of Honey from the People's Rep. of

China for Sunbeauty (Nov. 30, 2016), C.R. 67, ECF No. 38 at tab 6 ("*Bona Fides* Memo") at 2.

In its questionnaire responses, Sunbeauty reported that it sold honey to its importer

during the POR, and that each sale was for the same amount and the same price.[4] Moreover, each

---

[3]      Sunbeauty's unaffiliated U.S. importer was [[                              ]]. *See*
*Bona Fides* Memo at 2.

[4]      Each sale was for an amount of [[        ]] kilograms at the price of [[        ]].
*See Bona Fides* Memo at 2.

sale consisted of the same number (272) of two-liter bottles of honey. *See Bona Fides* Memo at 4. According to an online conversion tool, a two-liter bottle of honey would contain in excess of six pounds of honey.[5] Sunbeauty's importer entered the honey under a Harmonized Tariff Schedule of the United States ("HTSUS") subheading that covered honey bound for the wholesale market.[6]

In its *Bona Fides* Memo, the Department considered the factors set out in 19 U.S.C. § 1675(a)(2)(B)(iv)[7] to determine whether Sunbeauty's POR sales were *bona fide*. That is, Commerce sought to determine whether the sales were commercially reasonable or typical of normal business practices and would be representative of the company's sales should it receive a separate rate. *See Bona Fides* Memo at 5; Final I&D Memo at 5. In evaluating the statutory factors, Commerce determined, among other things, that the sales price, quantities, and certain expenses arising from the sales, together with Sunbeauty's failure to provide certain requested

---

[5]     *See* Online Food Calculator, https://www.aqua-calc.com/calculate/food-weight-to-volume (last visited Aug. 31, 2018).

[6]     Plaintiff's honey was entered under HTSUS subheading [[          ]], which covers [[
          ]]. *See Bona Fides* Memo at 2 (emphasis added).

[7]     These factors are: "the prices of such sales"; "whether such sales were made in commercial quantities"; "the timing of such sales"; "the expenses arising from such sales"; "whether the subject merchandise involved in such sales was resold in the United States at a profit"; "whether such sales were made on an arms-length basis"; and "any other factor [Commerce] determines to be relevant as to whether such sales are, or are not, likely to be typical of those the exporter or producer will make after completion of the review." 19 U.S.C. § 1675(a)(2)(B)(iv)(I)-(VII) (Supp. IV 2016).

documentation, and its admission of negligence in preparing certain record documents, weighed in favor of finding that the sales were not *bona fide*.[8] *See* Final I&D Memo at 6-12.

As to sales price, Commerce compared the average unit value for Sunbeauty's entries to (1) the average unit value for imports under the HTSUS subheading that Commerce found most specifically described Sunbeauty's honey,[9] and (2) the weighted-average unit value for all of the entries made under the appropriate broader HTSUS subheading, *i.e.*, 0409, during the POR.[10] *See Bona Fides* Memo at 6. In like manner, with respect to quantity, the Department compared the quantity of Sunbeauty's entries to the amount of honey (in kilograms) entered during the POR under (1) the HTSUS subheading that Commerce found most specifically described Sunbeauty's honey, and (2) HTSUS subheading 0409. The price and quantity figures Commerce used for purposes of making these comparisons are derived from proprietary U.S. Customs and Border Protection ("Customs") data.[11] Based on these comparisons, the Department found "the

---

[8]     Commerce concluded that the other statutory factors under § 1675(a)(2)(B)(iv), *i.e.*, the timing of the sales, profit on resale, and the arms-length nature of the transactions, did not weigh against a finding that the sales subject to the new shipper review were *bona fide*. *See Bona Fides* Memo at 8-9. Commerce's findings with respect to these factors are not in dispute.

[9]     Commerce found that HTSUS subheading [[
                                                                    ]] most specifically described Sunbeauty's honey. *See Bona Fides* Memo at 5.

[10]     Each of the [[     ]] entries made under the subheadings of HTSUS 0409 is identified in the record as a "Type 03" or "Type 07" entry, which is a designation that means the "[m]erchandise [was] subject to an antidumping or countervailing duty order . . . ." *Bona Fides* Memo at 3-4; *see also* Memo to File, Customs Data of U.S. Imports of Honey (Nov. 30, 2016), C.R. 68, ECF No. 38 at tab 14 ("Customs Data Memo").

[11]     The following table contains proprietary Customs data on honey imports from China during the POR found in Attachment I to the Customs Data Memo:

(footnote continued . . .)

*price* of Sunbeauty's sales to be *unusually high* and the *quantity* to be *unusually low*, indicating

the sales under review are non-*bona fide*." Final I&D Memo at 9 (emphasis added).

For expenses, Commerce considered a "lump sum fee" that Sunbeauty reported paying to

its logistics vendor.[12] *See* Sunbeauty's Resp. Suppl. Sec. A Quest. (June 7, 2016) at 11, C.R. 35,

ECF No. 38 at tab 21. When asked to "provide a more complete and detailed description of this

expense," Sunbeauty responded that it "mainly refer[red] to the charge for the service provided

for export customs declaration," and that the "'Lump Sum Fee' is based on the service

provided." Sunbeauty's Resp. Suppl. Sec. A, C Quest. (July 21, 2016) at 3, C.R. 38-42, ECF No.

38 at tab 16. When Commerce then asked that Sunbeauty "[d]etail all of the services" the vendor

provided for the lump sum fee, Sunbeauty reported that, according to its vendor, the lump sum

"include[d] customs clearance fee and drayage fee." Sunbeauty's Resp. Suppl. Sec. A, C & D

Quest. (Sept. 1, 2016) at 3, C.R. 54-57, ECF No. 38 at tab 15. Commerce found that Sunbeauty's

responses were inconsistent and failed to identify the service(s) covered by the lump sum.

---

[[

]]

[12]      "Sunbeauty reported that it contracted with [[
          ]] to handle the logistics and export procedures of its sales of subject merchandise
to the United States." *Bona Fides* Memo at 7.

Commerce found, therefore, that "while not dispositive, these unexplained expenses arising from the transaction contribute to our finding that Sunbeauty's sales are non-*bona fide*." *Bona Fides* Memo at 8; Final I&D Memo at 10.

Additionally, Commerce found not dispositive, but considered, Sunbeauty's failure to provide certain requested documentation, and its admission that it had been "negligent" in preparing certain paperwork that Sunbeauty placed on the record. *See* Final I&D Memo at 12-13 ("Sunbeauty's self-described 'negligence when preparing' the invoices it later submitted to the Department raises concerns about Sunbeauty's submissions as a whole and also the *bona fides* of Sunbeauty's sales, because this significant discrepancy means that the importer and, ultimately, the final U.S. customer made purchasing decisions with respect to the sale of Sunbeauty's honey without complete and accurate information.").

Accordingly, the Department preliminarily determined that "based on the totality of the circumstances the sales subject to this [new shipper review] [were] non-*bona fide* pursuant to [19 U.S.C. § 1675(a)(2)(B)(iv)]." Dec. Mem. for the Prelim. Results of the Antidumping Duty New Shipper Rev. of Honey from the People's Rep. of China: Sunbeauty (Nov. 29, 2016), P.R. 134, bar code 3526385-01, ECF No. 38 at tab 5 ("Preliminary Decision Memo") at 1. Commerce concluded, therefore, that it could not "rely on these sales to calculate a dumping margin," and, further, "there [were] no sales on which [it could] base [its] review." Preliminary Decision Memo at 4. Consequently, the Department preliminarily rescinded the new shipper review.

On March 30, 2017, Commerce published its Final Rescission Determination, in which it continued to find that Sunbeauty's sales were not *bona fide*, and therefore, could not provide a basis on which to calculate a dumping margin for Sunbeauty. *See* 82 Fed. Reg. at 15,697.

Accordingly, the Department rescinded the new shipper review. *See* Final I&D Memo at 1. This appeal followed.

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2012).

## LEGAL FRAMEWORK

Under the antidumping statute, an exporter or producer that did not export to the United States during the original period of investigation (and is not affiliated with an exporter or producer that did), *i.e.*, a "new shipper," may ask Commerce to review its U.S. sales of subject merchandise and calculate an individual weighted-average dumping margin applicable to the new shipper. *See* 19 U.S.C. § 1675(a)(2)(B)(i); *see Jinxiang Yuanxin Import & Export Co. v. United States*, 39 CIT __, __, 71 F. Supp. 3d 1338, 1344 (2015); *Shandong Chenhe Int'l Trading Co. v. United States*, 34 CIT 1472, 1482, Slip Op. 10-129 at 20 (Nov. 22, 2010) ("The purpose of a new shipper review is to determine an individual antidumping margin for an importer that did not receive a separate rate under an antidumping duty order."). To calculate an accurate margin for a new shipper, "Commerce must examine sales data that is indicative of the respondent's normal business practices so as to judge its future commercial behavior." *Shandong Chenhe*, 34 CIT at 1482, Slip Op. 10-129 at 20 (citation omitted). If the evidence of the POR sales on the record is "not indicative of typical business practices, no accurate individual rate can be set." *Id.*

Commerce determines the new shipper's dumping margin by comparing the "normal value and export price (or constructed export price) of each entry of the subject merchandise" during the POR. 19 U.S.C. § 1675(a)(2)(A)(i); *see Tianjin Tiancheng Pharm. Co. v. United States*, 29 CIT 256, 259, 366 F. Supp. 2d 1246, 1249 (2005). When calculating export price, Commerce excludes U.S. sales that are not *bona fide*.[13] 19 U.S.C. § 1675(a)(2)(B)(iv) (providing that the new shipper's individual margin "shall be based solely on the bona fide United States sales of [the] exporter or producer, as the case may be, made during the period covered by the review."). Commerce determines whether the sales are *bona fide* based on several statutory factors. In particular, the statute directs that Commerce "shall consider, depending on the circumstances surrounding such sales":

(I) the prices of such sales;

(II) whether such sales were made in commercial quantities;

(III) the timing of such sales;

---

[13]    The law's requirement that the U.S. sales must be *bona fide* was a response to concerns about the reported abuse of a previous rule that permitted an importer to post a bond, in lieu of a cash deposit, to secure payment of antidumping duties during the pendency of a new shipper review. This Court has summarized these concerns, as follows:

> For example, one method of abuse by exporters subject to high antidumping duty rates was to "enter into a scheme to structure a few sales to show little or no dumping" and obtain an expedited new shipper review. The atypical sales resulted in a zero or low antidumping duty rate. This allowed the importer to bring large quantities of the subject merchandise into the United States at "highly dumped . . . prices but with little or no cash deposit." By the time Commerce conducted an annual review of those subsequent sales and assigned the final duty rate, the importer could disappear or become nonresponsive, leaving Customs and Border Protection unable to collect the duties.

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 41 CIT __, __, 277 F. Supp. 3d 1375, 1381 n.7 (2017) (quoting and citing H.R. Rep. No. 114–114, pt. 1, at 89 (2015)).

(IV) the expenses arising from such sales;

(V) whether the subject merchandise involved in such sales was resold in the United States at a profit;

(VI) whether such sales were made on an arms-length basis; and

(VII) any other factor [Commerce] determines to be relevant as to whether such sales are, or are not, likely to be typical of those the exporter or producer will make after completion of the review.

19 U.S.C. § 1675(a)(2)(B)(iv). These statutory factors codify Commerce's "totality of the circumstances" test. *See Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 41 CIT __, __, 277 F. Supp. 3d 1375, 1382 (2017) (citing Trade Facilitation and Trade Enforcement Act of 2015, Pub. L No. 114–125, § 433, 130 Stat. 122 (2016)).

Commerce's regulations provide for rescission of a review where "there has not been an entry and sale to an unaffiliated customer in the United States of subject merchandise" during the POR. *See* 19 C.F.R. § 351.214(f)(2)(i) (2016). "Commerce interprets the term 'sale' in [19 C.F.R.] § 351.214(f)(2)(i) to mean that a transaction it determines not to be a *bona fide* sale is, for purposes of the regulation, not a sale at all." *Shijiazhuang Goodman Trading Co. v. United States*, 40 CIT __, __, 172 F. Supp. 3d 1363, 1373 (2016). Thus, if Commerce determines that none of a new shipper's U.S. sales during the POR were *bona fide*, it must end the review because "no data will remain on the export price side of Commerce's antidumping duty calculation." *Tianjin*, 29 CIT at 259, 366 F. Supp. 2d at 1249.

## DISCUSSION

At the heart of this case is whether substantial evidence supports Commerce's determination that Sunbeauty's sales during the POR were not *bona fide*. For plaintiff, the record does not support: (1) Commerce's use of averages as a means to compare the price and quantity

of Sunbeauty's sales to other POR entries of subject merchandise; (2) Commerce's decision to compare Sunbeauty's sales, which plaintiff argues were not bound for the wholesale market,[14] with POR entries under the HTSUS subheading that Commerce found most specifically described Sunbeauty's sales; (3) Commerce's finding that Sunbeauty's questionnaire responses were inconsistent and failed to explain a reported "lump sum fee"; and (4) Commerce's finding that certain deficiencies and discrepancies in Sunbeauty's questionnaire responses, and Sunbeauty's admission that it prepared certain paperwork on the record negligently, supported its non-*bona fide* determination. As will be seen, however, none of Sunbeauty's arguments persuade the court that remand is required here.

I.    **Substantial Evidence Supports Commerce's Use of Averages as a Means to Compare the Price and Quantity of Sunbeauty's Sales to Those of Other POR Entries of Subject Merchandise**

In the Final Rescission Determination, the Department found "the price of Sunbeauty's sales to be unusually high[15] and the quantity to be unusually low,[16] indicating the sales under

---

[14]     Sunbeauty makes this argument even though its honey was entered under HTSUS subheading [[          ]], which covers [[

          ]]. *Bona Fides* Memo at 2 (emphasis added). The HTSUS subheading that Commerce found most specifically described Sunbeauty's sales, [[          ]], covers [[

          ]]. *Bona Fides* Memo at 4.

[15]     In particular, with respect to price, Commerce stated:

[[     ]] of Sunbeauty's [[               ]] honey sales was for [[        ]], and the quantity for each was [[        ]] kilograms, resulting in a unit value of [[        ]] per kilogram. . . . The . . . [average unit value] . . . for entries under HTSUS [[            ]] is [[       ]], making Sunbeauty's [average unit value] [[            ]]. The [weighted-average unit value] for . . . entries of subject

(footnote continued . . .)

review [were] non-*bona fide*." Final I&D Memo at 9. The Department arrived at its conclusion,

as to price, by comparing the average unit value for Sunbeauty's entries to (1) the average unit

value for imports under the HTSUS subheading that Commerce found most specifically

described Sunbeauty's honey, and (2) the weighted-average unit value for imports under the

appropriate broader HTSUS subheading, *i.e.*, 0409, during the POR. Similarly, with respect to

quantity, the Department compared the average quantity of Sunbeauty's entries to (1) the average

quantity of imports under the HTSUS subheading that Commerce found most specifically

described Sunbeauty's honey, and (2) the average quantity of imports under HTSUS subheading

0409 during the POR. *See Bona Fides* Memo at 5-7.

Before Commerce, Sunbeauty argued that instead of comparing average prices and

quantities, the Department should compare "the quantity and unit values of Sunbeauty's entries

---

merchandise under subheading 0409 is [[          ]]. In comparison, the [average
unit value] for Sunbeauty's sale(s) of subject merchandise is [[               ]].

*Bona Fides* Memo at 6. Based on these comparisons, Commerce found "the [average unit value]
for Sunbeauty's sale(s) to be significantly [[        ]] in relation to the unit values of other POR
entries from [China] of known subject merchandise." *Bona Fides* Memo at 6. It is worth noting
that there was [[                                                        ]].

[16]       With respect to quantity, Commerce stated:

Each of Sunbeauty's [[                              ]] honey sales was for [[      ]]
kilograms, or a total quantity of [[          ]] kilograms. . . . The average quantity
for POR entries from [China] of entries under HTSUS [[                   ]] is
[[         ]] kilograms. In comparison, the average quantity of Sunbeauty's sales,
[[        ]] kilograms, was [[                   ]]. The average quantity for POR
entries from [China] of entries under subheading 0409 subject to antidumping or
countervailing duties is [[                ]] kilograms. In comparison, the average
quantity of Sunbeauty's sales was [[                    ]].

BPI Memo at 6-7. Based on these comparisons, Commerce found "the quantities of Sunbeauty's
U.S. sales of [[                      ]] honey to be [[            ]] in relation to the quantities of other
POR entries under HTSUS [[                    ]] and . . . subheading 0409 . . . ." BPI Memo at 7.

with the *range*[17] of quantity and unit values as found in [Customs] data of entries under HTSUS

subheading 0409." Final I&D Memo at 2-3 (emphasis added). Sunbeauty maintained that, under

the range method, the record evidence supported the conclusion that its sales were *bona fide*

because its POR sales were not the highest in terms of price or lowest in terms of quantity,

according to Customs data. *See* Final I&D Memo at 3. Thus, for Sunbeauty, using a range

method to examine its sales, they would not be found aberrational in terms of sale price or

volume. *See Hyundai Steel Co. v. United States*, 42 CIT __, __, Slip Op. 18-80 at 46 (June 28,

2018) ("A sale is aberrational when it deviates from the usual or normal way or may be regarded

as atypical.") (citation omitted).

      Commerce disagreed, however, that range was the appropriate method to use based on

the record here.[18] For Commerce, while the price and quantity of Sunbeauty's sales may have

---

[17]     The range method has been found to be appropriate when a gradual curve in pricing exists. For example, in *Frozen Fish Fillets*, Commerce compared the price and quantity of a new shipper's sale to the averages of Customs data, and observed that a new shipper's price "[did] not appear to be an outlier when compared to other prices evidenced in the [Customs] data." *Certain Frozen Fish Fillets From the Socialist Rep. of Vietnam*, 74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009), and accompanying Issues and Dec. Mem., Cmt. 8.

[18]     Commerce stated:

    The [Customs] data on the record for this new shipper review does not support a use of range as a means of comparison because it contains [[     ]] entries with values much [[     ]] and quantities much [[     ]] than those of the other entries. These [[     ]] preclude a useful comparison based on range because the range does not present a gradual curve in pricing, but instead these two [[     ]] entries represent a [[        ]] from the [[        ]] data such that they do not provide a meaningful reference point for our analysis.

BPI Memo at 2 (first citing Customs Data Memo and then citing *Certain Frozen Fish Fillets From the Socialist Rep. of Vietnam*, 74 Fed. Reg. at 11,349) (footnote omitted).

fallen within the range of other POR entries, the presence of two aberrant entries[19] made by other

sellers during the POR resulted in the range method being less useful in this case than comparing

averages. *See* Customs Data Table *supra* note 11. Commerce stated that it "has previously

looked at the range of entries when there is a *gradual curve* in pricing or where there were

entries with similar quantities and prices, not merely where the quantity and price of the sales

under review exist within the range of [Customs] data," and that "[n]o such pattern exists here."

*See* Final I&D Memo at 8 (footnotes omitted; emphasis added). Accordingly, Commerce

declined to use the range method.

Before the court, Sunbeauty argues that Commerce's use of the average method, instead

of the range method, is unsupported by substantial evidence. To make this argument, Sunbeauty

compares the average unit values and quantities calculated for Sunbeauty's POR entries to those

for the entries in the Customs dataset, including the aberrant entries. Based on the results of this

comparison, plaintiff concludes that "the average methodology cannot correctly determine

whether *any* entries are *bona fide*." Pl.'s Br. 12 (emphasis added). Plaintiff contends this is so

because the aberrant entries represent a "significant portion" of the Customs data.[20] Pl.'s Br. 14.

---

[19]        The aberrant entries were [[

                                                                                            ]].

[20]        Sunbeauty argues:

By applying the [average] methodology and following Commerce's logic, [[
        ]] of the [[        ]] entries . . . are found not *bona fide* while in fact they are.
For instance, . . . entry [[      ]] . . . has a unit value [[                    ]] than the
weight[ed]-average . . . and its quantity is [[                      ]] than the average
quantity. Similarly, . . . entry [[     ]] . . . has a unit value [[            ]] than the
weighted-average and its quantity is [[                      ]] than average. In other
words, the average methodology cannot correctly determine whether any entries

(footnote continued . . .)

Sunbeauty makes this argument even though the volume of the entries it claims make up a "significant portion" of the Customs data amount to less than one percent of the total volume of entries Commerce considered.[21]

Additionally, for Sunbeauty, the Customs dataset that yielded the average unit values and quantities was small, and therefore, unrepresentative of Sunbeauty's high price, low quantity entries during the POR. *See* Pl.'s Reply Br. 6 ("The risks or limitations of applying [an average] methodology . . . are [that] certain [high quantity] entries . . . may have more influence in a small [dataset] than other [low quantity] entries . . . . Thus, the average number *no long*[*er*] *represents the entire data group* but only the [high quantity] entries . . . .").

Rather than the average method, Sunbeauty contends that Commerce should have used the range method, insisting that it is the Department's "long standing practice[]" to do so. *See* Pl.'s Br. 16. To make its case, Sunbeauty points to previous administrative proceedings in which Commerce found that using the range method was appropriate—that is, where the record demonstrates a gradual curve in sales prices. *See* Pl.'s Br. 14-16 (citing various administrative decisions and confidential case-specific memoranda regarding Commerce's *bona fides* determinations); Pl.'s Reply Br. 14. Indeed, Sunbeauty contends that, contrary to Commerce's finding, a gradual curve in pricing exists here. *See* Pl.'s Br. 13. That is, based on its calculations, Sunbeauty maintains that "there is a strong linear relationship between price and quantity

---

are *bona fide*. Thus, it is not a correct or appropriate approach to compare quantity and value in this case.

Pl.'s Br. 12-13; *see* Customs Data *supra* note 11.

[21]     The total quantity of aberrant sales was [[    ]] kilograms, less than one percent of [[          ]] kilograms, the total volume of entries of merchandise entered under HTSUS subheading 0409. *See supra* note 11.

because the regression coefficient is . . . very close to 1," and therefore that "[s]uch evidence

suggests that . . . a gradual curve exists in pricing for the [Customs] data and guarantees a useful

comparison based on range." Pl.'s Br. 13.

In response to plaintiff's arguments, the Government counters that whereas "Sunbeauty

cites to no case, practice, or legal standard that would require Commerce not to rely upon an

average comparison, or to evaluate the average comparisons of other entries," this Court has

upheld the comparison of a new shipper's prices with the weighted-average unit value "where

such a comparison is useful." Def.'s Br. 20 (citing *Jinxiang Chengda Imp. & Exp. Co. v. United

States*, 37 CIT __, __, Slip Op. 13-40 at 9-10 (Mar. 25, 2013); *Zhengzhou Huachao Indus. Co. v.

United States*, 37 CIT __, __, Slip Op. 13-61 at 18-19 (May 14, 2013)).

As for Sunbeauty's argument that "a gradual curve exists in pricing for the Customs data,

such that a range comparison would be useful," the Government asserts that "[t]his is incorrect."

Def.'s Br. 20. For the Government, Commerce correctly found that "the range does not represent

a gradual curve in pricing, but instead . . . two [aberrant] entries represent a [[                    ]]

from the [[       ]] data such that they do not provide a meaningful reference point for

[Commerce's] analysis." Def.'s Br. 21. In other words, Commerce insists that Sunbeauty's prices

do not show a gradual curve but rather a sharp break from other prices during the POR.

Commerce's decision to analyze Sunbeauty's sales using average unit values and

quantities is supported by substantial evidence on the record. The thrust of Sunbeauty's argument

against the use of the average method is that when the Department compares the price and

quantity of imports using averages, the high volume, low price entries overwhelm the low

volume, high price entries. This observation is both true and demonstrative of the validity of

Commerce's choice of method.

Neither party disputes that the decision to compare price and quantity data by means of the average method or the range method depends on the specific facts of each case. *See Hebei New Donghua Amino Acid Co. v. United States*, 29 CIT 603, 611 n.5, 374 F. Supp. 2d 1333, 1340 n.5 (2005) ("[W]hile some *bona fides* issues may share commonalities across various Department cases, each one is company-specific and may vary with the facts surrounding each sale." (internal quotation marks and citation omitted)). In past cases, the Department has used the range method where the record shows that a gradual curve in pricing exists. For example, in *Frozen Fish Fillets*, Commerce compared the price and quantity of a new shipper's sale to the averages of Customs data, and observed that the new shipper's price "[did] not appear to be an outlier when compared to other prices evidenced in the [Customs] data." *Certain Frozen Fish Fillets From the Socialist Rep. of Vietnam*, 74 Fed. Reg. at 11,349, and accompanying Issues and Decision Mem., Cmt. 8. There, Commerce noted "[s]pecifically, when all the entries are grouped by manufacturer, [the new shipper's] *price is not so different from the prices right below it*. In other words, the [Customs] data shows a gradual curve of prices, not a sharp curve separating [the new shipper's] price from the other prices from [Customs]." *Id*. (noting same with respect to quantity) (emphasis added). Unlike in *Frozen Fish Fillets*, here Commerce found that a gradual curve did not exist among the prices on the record.

Commerce is right. Indeed, even the most casual glance at the data used by Commerce reveals that the subject sales cited by Sunbeauty represent not a gradual curve but a cliff.[22] That is, the volume of the sales is so tiny and their price so high, that they are clearly the kind of

---

[22]     Commerce reasonably found that the average unit values on the record show a [[              ]] between the average unit value of the aberrant entries, [[                    ]], and the [[          ]] average unit value [[                ]]. *See* BPI Memo at 2.

outliers not found in *Frozen Fish Fillets*. *See* Business Proprietary Information Mem. for

Sunbeauty (Mar. 27, 2017), C.R. 73, ECF No. 38 at tab 3 ("BPI Memo") at 6-7.

Moreover, using the average method as a means of comparison was reasonable based on

the record. This Court has sustained Commerce's use of average unit values derived from

Customs data as a "useful tool for comparison because it provides a fair representation of prices

set by the market." *Jinxiang Chengda*, 37 CIT at __, Slip Op. 13-40 at 9; *see also U.S. Steel Grp.*

*v. United States*, 96 F.3d 1352, 1363 (Fed. Cir. 1996) ("Computing an average . . . permits

compression of large quantities of data into a single representative figure capable of easy

comprehension and assimilation."). Here, Commerce compared the average unit value for

Sunbeauty's entries, [[          ]], to the average unit value for imports under the HTSUS

subheading that Commerce found most specifically described Sunbeauty's honey, [[          ]],

as well as to the weighted-average unit value for imports under the appropriate broader HTSUS

subheading, *i.e.*, 0409, [[          ]], and concluded that the price of Sunbeauty's POR sales

was unusually high. The Department performed the same procedure using the quantity of honey

imports and found that Sunbeauty's import quantity was unusually low. *See* Final I&D Memo

at 9.

By weight-averaging the value and quantity of the entries under the broader HTSUS 0409

subheading, including the aberrant entries, Commerce could see the differences in value and

quantity among the entries in the Customs dataset, thereby providing a fair representation of

prices and quantities normally present in the market. Sunbeauty complains that weight-averaging

causes the high volume, low price sales to overwhelm the low volume, high price sales; and so

they do. Where, as here, the low volume, high price sales are so clearly "outliers," *see* Issues and

Dec. Mem., Cmt. 8, accompanying *Certain Frozen Fish Fillets From the Socialist Rep. of*

*Vietnam*, 74 Fed. Reg. at 11,349, weight-averaging serves to provide a valid point of comparison for judging if the price of Sunbeauty's entries was "typical of those" it will charge "after the completion of the review," 19 U.S.C. § 1675(a)(2)(B)(iv)(VII), "because [weight-averaging] provides a fair representation of prices set by the market." *Jinxiang Chengda*, 37 CIT at __, Slip Op. 13-40 at 9.

Using the entries of small quantities with high prices as a part of a range would serve to distort the results by giving them more significance than they warrant. Using an average, on the other hand, results in the significance of the entries being reduced. This reduction is what plaintiff objects to, but it places these entries in their proper perspective.

Based on the record here, Commerce's use of averages as a means of comparing the price and quantity of Sunbeauty's imports is sustained.

## II.   Substantial Evidence Supports Commerce's Comparison of Sunbeauty's Sales to Honey Entered Under the HTSUS Subheading Selected by Commerce

Sunbeauty objects to the HTSUS subheading used by Commerce, in part, to find comparable entries of honey during the POR for purposes of analyzing price and quantity.[23] Sunbeauty argues that Commerce should not have used a subheading for honey that would enter the wholesale market. Plaintiff makes this argument even though it entered its honey under a subheading for honey to be sold at wholesale. As has been noted, in reaching its price and quantity findings, Commerce compared Sunbeauty's entries with Customs data for (1) imports under the HTSUS subheading that Commerce found most specifically described Sunbeauty's

---

[23]    Commerce used HTSUS subheading [[                                    ]]  in  its  price and quantity comparisons. *Bona Fides* Memo at 4.

honey, and (2) all of the entries using the subheadings found under HTSUS subheading 0409 that were made during the POR.

In the Final Rescission Determination, Commerce compared the average unit values and average quantities of Sunbeauty's sales with Customs data for entries under the HTSUS subheading that it found most specifically described Sunbeauty's honey based on the record. *Bona Fides* Memo at 4; BPI Memo at 1. For Commerce, its preferred subheading accurately described Sunbeauty's honey, both in terms of its color and whether it was bound for the wholesale market.

As to color, Commerce asserted that while Sunbeauty's importer had entered the subject honey as [[       ]] honey, pursuant to HTSUS subheading [[

]],      in      questionnaire responses, Sunbeauty, its importer, and the honey producer, Xiping Haina Trade Co., Ltd. ("Xiping") claimed that the color was not [[             ]] but [[               ]]. *See* BPI Memo at 1 (emphasis added; footnotes omitted). Based on Sunbeauty's response, Commerce concluded that with respect to the color of Sunbeauty's honey, "record evidence show[ed] that a comparison against entries made under HTSUS [[

]] would be more specific to . . . Sunbeauty's sales." BPI Memo at 1 (emphasis added). Commerce's finding with respect to the color of the imported honey is uncontested.

Additionally, Commerce determined that the record showed Sunbeauty's honey was bound for the wholesale market. Commerce stated, by way of explanation:

> [Sunbeauty's importer] entered the sales as [[                 ]] on . . . its entry summaries. [Sunbeauty's importer] did not submit images of the packages or any labels affixed to the packages of merchandise subject to this review in response to the Department's questionnaire. Additionally, [Sunbeauty's importer] [[

]] of the merchandise, but rather the ultimate U.S. customers [[                    ]], and [Sunbeauty's importer] is not aware whether the ultimate U.S. customer later sold the honey as retail merchandise. Nor is there other record information supporting the contention that Sunbeauty's sales were packaged [[                    ]]. As such, the Department has no evidence that the final customer sold the honey as retail merchandise in its original packaging. Furthermore, Sunbeauty's sales each consisted of 272 2-liter bottles individually packed with [[                ]] of honey each. The amount of honey Sunbeauty packed per bottle is at least [[      ]] larger than a three-pound jug of honey, the largest example of retail honey Sunbeauty placed on the record.

BPI Memo at 1-2 (footnotes omitted). As noted earlier, a two-liter bottle of honey would contain in excess of six pounds of honey. In light of the foregoing, Commerce concluded that the record evidence did not show that Sunbeauty's honey was sold at retail in its original packaging.[24] *See Bona Fides* Memo at 4.

Before the court, Sunbeauty insists that the record shows its honey was not bound for the wholesale market and that, therefore, comparing its sales to imports under HTSUS subheading [[                    ]] was improper. Instead, for Sunbeauty, "Commerce should compare Sunbeauty's [POR] sales either with Sunbeauty's sales after [the] POR or with U.S. entries from the . . . broader [heading,] HTSUS 0409, Natural Honey, during the POR." Pl.'s Br. 11. As noted, one of Commerce's two comparisons was of Sunbeauty's entries to entries made under the subheadings of HTSUS 0409. In other words, Commerce did, in fact, conduct the comparison

---

[24]      Commerce stated:

[T]he Department continues to find that a comparison of Sunbeauty's sales to entries of honey [[                    ]] is the most appropriate because the record lacks any evidence showing the final customer sold the honey as retail merchandise in its original packaging, and the individual size [*i.e.*, in excess of six pounds] of Sunbeauty's honey is more similar to honey [[      ]] in comparison to other retail honey on the record.

BPI Memo at 2.

urged by Sunbeauty. Thus, the court understands Sunbeauty's claim to be limited to the other comparison, *i.e.*, the comparison of Sunbeauty's sales to imports entered under the HTSUS subheading selected by Commerce, [[                    ]].

In support of its claim, Sunbeauty argues that there is record evidence that the final customer did not sell Sunbeauty's honey at wholesale. For Sunbeauty, "[t]he [[                    ]] on the purchase order of Sunbeauty's unaffiliated U.S. customer is a clear indicator that the subject merchandise is used [[                    ]]." Pl.'s Br. 10.

Next, Sunbeauty takes issue with particular factual findings based on the record evidence, arguing that the record does not support Commerce's finding that Sunbeauty's importer's customers [[                                        ]]. Specifically, Sunbeauty points to invoices from a freight carrier and certain customs entry forms, the dates on which show, according to plaintiff, that Sunbeauty's importer [[                    ]] of the honey "for a period of time before [downstream] sales." Pl.'s Br. 10. Plaintiff also points to other record evidence (*i.e.*, "purchase orders or order confirmation[s] from [the importer's] customers"), arguing that the evidence "suggest[s] that those customers are [[                    ]] rather than [[                                ]]." Pl.'s Br. 10-11.

Finally, Sunbeauty submits that the quantity of its honey exports supports a finding that its honey was sold at retail in its original packaging. In particular, Sunbeauty asserts that Commerce failed to adequately consider "that the smallest example of honey [[                    ]] on record, [[                        ]], is approximately [[            ]] larger than Sunbeauty's package." Pl.'s Br. 11 (footnote omitted). For Sunbeauty, "[b]y simply comparing [[        ]] and [[            ]], normal and reasonable people would agree that Sunbeauty's

package is much more close to the retail package on record, and that Sunbeauty's honey [was]

[[                              ]]." Pl.'s Br. 11.

As an initial matter, the court notes that there is no dispute that HTSUS subheading

[[                                              ]] accurately describes the color of

Sunbeauty's honey sales during the POR. Indeed, before Commerce, Sunbeauty, its importer,

and its producer presented evidence to show that the honey was [[                 ]] in color.

*See* BPI Memo at 1. Nor is there any dispute that Sunbeauty's importer entered the subject honey

as bound for the wholesale market on customs entry forms. *See* Sunbeauty's Resp. Importer-

Specific Questionnaire (July 22, 2016), C.R. 46-47 Ex. 7, ECF No. 38 at tab 10 (describing

Sunbeauty's entries as [[                              ]]).

Sunbeauty insists, nonetheless, that its honey was not bound for wholesale. The record

evidence Sunbeauty cites in support of its argument, however, does not demonstrate that this is

the case. For example, plaintiff cites to no record evidence explaining just how a [[          ]]

on a purchase order supports its claim that the goods were packaged for individual sale, instead

of for sale to, *e.g.*, a [[                    ]]. That is, plaintiff has not buttressed its claim

with evidence. Instead, plaintiff has relied on "common sense" as support for its argument. *See*

Sunbeauty Case Br., C.R. 71 at 6, ECF 38 at tab 8 ("As common sense, [[            ]] is

designed for [[        ]] and widely used in [[                ]]."). Absent actual evidence that

the [[                ]] indicates that its products were packaged for retail sale this claim is

unconvincing.

Next, plaintiff cites   freight invoices on the record that indicate that the destination of

the honey was [[                ]] county. While this is the same county where Sunbeauty's

importer's customers were located, the   invoices do not mention the customers' names, or

contain any indication of whether or not those customers sold the honey at retail. Likewise, though plaintiff asserts that the " purchase orders or order confirmation[s]      from [the importer's] customers . . . suggest that those customers are [[                    ]] rather than [[                                        ]]," plaintiff fails to explain this assertion. Pl.'s Br. 10-11. Rather, plaintiff maintains that it is "common sense that [[                    ]] would sell merchandise to [[                        ]] in its original packaging rather than repack or process for other purposes." Pl.'s Br. 11. However self-evident this proposition may be to Sunbeauty, Commerce may not rest its determinations on a respondent's "common sense" in place of evidence.

The record is clear, however, that Sunbeauty's importer designated the subject honey as headed for the wholesale market in customs entry forms. *See* Sunbeauty's Resp. Importer-Specific Questionnaire (July 22, 2016), C.R. 46-47 Ex. 7, ECF No. 38 at tab 10 (describing Sunbeauty's entries as [[                                    ]]). This designation comports with other record evidence regarding Sunbeauty's sales—specifically, each of the 272 two-liter bottles weighing in excess of six pounds. This per-bottle amount was much larger than a three-pound jug of honey, *i.e.*, "the largest example of retail honey [that] Sunbeauty placed on the record." BPI Memo at 2.

Sunbeauty attempts to distinguish its honey sales from honey bound for the wholesale market by arguing that "that the smallest example of honey [[                        ]] on record, [[                    ]], is approximately [[                ]] larger than Sunbeauty's package." Pl.'s Br. 11 (footnote omitted). Applying Sunbeauty's common sense analysis, however, compels the conclusion that merely because a 300-kilogram (661-pound) drum of

honey was unlikely to end up on a grocer's shelf, a jar packed with six pounds of honey would necessarily be headed for the local supermarket.

The record here supports the Department's conclusion that HTSUS subheading [[                    ]] specifically describes Sunbeauty's honey both in terms of it color and that it was bound for the wholesale market. *See* BPI Memo at 2 (finding that "a comparison of Sunbeauty's sales to entries of honey [[                              ]] is the most appropriate because the record lacks any evidence showing the final customer sold the honey as retail merchandise in its original packaging, and the individual size of Sunbeauty's honey is more similar to honey [[                              ]] in comparison to other retail honey on the record."). Accordingly, Commerce's decision, with respect to one of its two comparisons, to compare the price and quantity of Sunbeauty's honey entries with the price and quantity of honey imported under HTSUS subheading [[                ]], is sustained.

## III.  Substantial Evidence Supports Commerce's Finding that Reported Expenses Weighed in Favor of a Non-*Bona Fides* Determination

Among the statutory factors that Commerce must consider in reaching its *bona fides* determination are "the expenses arising from such sales." 19 U.S.C. § 1675(a)(2)(B)(iv)(IV). The significance of reported expenses to Commerce's determination depends on the facts of a particular case, but the nature or amount of the expenses can be relevant to Commerce's determination. *See, e.g.*, *Windmill Int'l Pte., Ltd. v. United States*, 26 CIT 221, 231, 193 F. Supp. 2d 1303, 1313 (2002) ("Commerce's reasons for determining that Windmill's sale was non-bona fide included . . . the extraordinary high air freight cost and other expenses incurred by the United States purchaser that were significantly greater than the total value of the sale . . . .") (internal quotation marks and citation omitted).

Sunbeauty reported paying a "lump sum fee" to its logistics vendor for customs clearance services. Commerce issued a supplemental questionnaire designed to elicit more information and supporting documentation about the services that Sunbeauty received and paid for. Sunbeauty's response, however, did not clarify what services it had paid for; rather it raised more questions. As discussed in the Final I&D Memo:

> According to Sunbeauty, [its] unaffiliated logistics company invoiced Sunbeauty for a lump sum fee associated with each export, and Sunbeauty initially cited this fee as a service charge related to the "export procedure" and the "service provided (time consumed to process paperwork)." When asked to detail all of the services included in the lump sum fee, Sunbeauty only stated that it includes a "custom clearance fee and drayage fee." Sunbeauty also stated that the unaffiliated logistics company's cost structure and general market condition affect its quote for the lump sum fee, but failed to provide any documentation from the unaffiliated logistics company outlining its cost structure or the general market condition at the time such that it would have affected its quote.

Final I&D Memo at 9 (footnotes omitted). Put another way, Sunbeauty simply could not, or would not, say what it was paying for. With respect to the "lump sum fee," Commerce found that "Sunbeauty failed to explain the services rendered in association with this export expense," and its "inconsistent responses regarding the lump sum fee continue[d] to contribute to [its] finding that Sunbeauty's sales [were] non-*bona fide*, because it is unclear what the nature of this lump sum fee is." Final I&D Memo at 10.

Plaintiff challenges Commerce's interpretation of Sunbeauty's questionnaire responses as "inconsistent." Specifically, plaintiff maintains that

> Commerce incorrectly concluded that Sunbeauty's statements with regard to [the] lump sum fee are inconsistent in its *Bona Fide* Memo because Commerce failed to recognize that the second response is from the Sunbeauty's unaffiliated logistic[s] vendor. Although Commerce may overlook the phrase of "{a}ccording to [the vendor]" in the beginning of Sunbeauty's response, Commerce, as the designer of questionnaire, should be aware that Sunbeauty would not be able to answer any questions related to the cost structure or pricing model of Sunbeauty's unaffiliated logistic[s] vendor. Commerce should have a general expectation that Sunbeauty's unaffiliated logistic[s] vendor would be the better respondent to

> answer these questions and probably provide a different statement due to [the] different perspective and understanding of logistics business. Thus, it is completely normal and reasonable for Sunbeauty to characterize the lump sum fee as a service charge while its unaffiliated logistic[s] vendor detailed such service charge into custom clearance fee and drayage fee which are completely normal and regular export expenses. Like the two sides of a coin, different angles (perspectives) result in different appearances (statements), but different appearances (statements) still suggest the same coin (fact).

Pl.'s Br. 16-17. With respect to Sunbeauty's alleged failure to supply supporting information regarding its vendor's cost structure or market conditions that may have affected the amount the vendor charged Sunbeauty for its services, plaintiff argues that (1) Commerce never requested such documentation, and (2) the cost structure is a "business secret." Pl.'s Br. 17. Plaintiff maintains that without an explicit request for this information from Commerce, "it would be impossible or extremely difficult for Sunbeauty to obtain such documents from its unaffiliated logistic[s] vendor." Pl.'s Br. 17.

Plaintiff's characterization of its own statements in its original and supplemental responses as "different," rather than "inconsistent," Pl.'s Br. 16, misses the mark. By its questionnaires, Commerce sought information from Sunbeauty regarding, among other things, expenses that it incurred in connection with its POR sales. These expenses matter because they are one of the statutory factors relevant to Commerce's determination of whether those sales are *bona fide*. *See* 19 U.S.C. § 1675(a)(2)(B)(iv)(IV). Sunbeauty reported that it incurred a "lump sum fee," among its expenses. *See* Sunbeauty's Resp. Suppl. Sec. A Quest. (June 7, 2016) at 11, C.R. 35, ECF No. 38 at tab 21. Subsequently, Commerce asked Sunbeauty to "provide a more complete and detailed description of this [lump sum] expense," and Sunbeauty responded that it "mainly refer[red] to the charge for the service provided for export customs declaration," and that the "'Lump Sum Fee' is based on the service provided." Sunbeauty's Resp. Suppl. Sec. A, C Quest. (July 21, 2016) at 3, C.R. 38-42, ECF No. 38 at tab 16. When Commerce then asked that

Sunbeauty "[d]etail all of the services" the vendor provided for the lump sum fee, Sunbeauty's entire response was, "According to [the vendor], its 'Lump Sum Fee' includes custom clearance fee and drayage fee." *See* ECF No. 38 at tab 15 p. 3.

It can hardly be said that Sunbeauty's response detailed all the services provided by the vendor in exchange for the lump sum fee, or clarified which portion of the lump sum constituted payment for those services. Moreover, contrary to plaintiff's argument, Commerce expressly directed Sunbeauty to "[i]nclude documentation to support [its] response," which Sunbeauty failed to do. Thus, it was reasonable for Commerce to conclude that Sunbeauty's "different" statements were inconsistent, and failed to clarify the nature of the services covered by the lump sum fee. Indeed, much of Sunbeauty's questionnaire response amounts to a claim that the company was willing to pay a fee without any clear idea as to what it was for. It is little wonder that the Department found this explanation lacking.

Plaintiff's claim that it could not provide its vendor's cost structure and the general market conditions, that reportedly affected its vendor's quote for freight and the "lump sum fee," because they were "business secrets," does not excuse Sunbeauty's failure to answer Commerce's questions as to what services the company received for its money. *See* Final I&D Memo at 9. Under Commerce's regulations, Sunbeauty could have supplied a public summary of the requested information to Commerce, *see* 19 C.F.R. § 351.304(c)(1), or included the needed explanation in its lengthy claim of confidential business proprietary information in the record it made, that is now before the court.

Finally, it is the burden of interested parties to a proceeding to create an adequate record. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016) (citing *QVD Food Co. v. United States,* 658 F.3d 1318, 1324 (Fed. Cir. 2011)). Plaintiff may not deflect

that burden by asserting that "Commerce should have a general expectation that Sunbeauty's unaffiliated logistic[s] vendor would be the better respondent to answer these questions . . . ." Pl.'s Br. 16. Accordingly, Commerce's finding that reported expenses weighed in favor of a non-*bona fides* determination is sustained.

## IV.    Substantial Evidence Supports Commerce's Determination that Additional Factors Were Relevant to its *Bona Fides* Analysis

The remainder of plaintiff's arguments ask the court to find unreasonable Commerce's determination that certain deficiencies and discrepancies in Sunbeauty's questionnaire responses, were relevant to its determination that Sunbeauty's sales were not *bona fide*.

At the outset it must be noted that Sunbeauty does not dispute that it failed to provide information that Commerce asked for regarding its importer's purchases from other suppliers. Nor does Sunbeauty argue that the statute prohibits Commerce from considering deficiencies and discrepancies in questionnaire responses as a factor in its *bona fides* analysis. Rather, plaintiff appears to contest the Department's decision to attach relevance to these deficiencies and discrepancies when making its *bona fides* determination. Plaintiff makes several arguments, none of which persuade the court that the Department committed any error here.

First, Sunbeauty failed to provide its importer's purchase orders, invoices, and packing lists from third party suppliers, as Commerce requested. The Department sought this information from Sunbeauty's importer "to determine whether the price and quantity of the sales subject to this . . . review are not atypical and whether the subject sales provide a reasonable basis to calculate an [antidumping] margin," noting that "this information was not within any of the other record evidence cited by Sunbeauty." Final I&D Memo at 11.

Plaintiff contends that this documentation was a "business secret" and unrelated to the POR sales under review, and, in any event, the record contained other information that could "cure" the deficiency in Sunbeauty's response. *See* Pl.'s Br. 18-20. This "no harm no foul" argument is unconvincing. Commerce designs its questionnaires to elicit information that it has determined it requires to perform its *bona fides* analysis, and Sunbeauty had the burden to respond with the requested information to create an adequate record. *See Nan Ya Plastics Corp.*, 810 F.3d at 1337-38. To the extent that information responsive to Commerce's request was business proprietary, Sunbeauty could have supplied a public summary or included it as confidential business proprietary information. *See* 19 C.F.R. § 351.304(c)(1).

Second, plaintiff contends that Commerce unreasonably failed to accept copies of invoices and cleared checks provided by Sunbeauty's importer's customs broker, as a substitute for the importer's accounting ledgers reflecting the payment of customs duties. For Commerce, "[t]he Department's ability to evaluate whether full payment of all expenses surrounding the sale were made, including customs duties, is additionally necessary to examine whether the sale is atypical." Final I&D Memo at 11. Plaintiff maintains that Commerce's request for "accounting records" did not specify precisely which type of record the Department required, and in any event, the information Sunbeauty provided ("source documents") was "better than the secondary source documents such as general [ledgers]." Pl.'s Br. 19. This claim, however, ignores the Importer-Specific Supplemental Questionnaire, where Commerce asked that Sunbeauty "submit copies of [its importer's] accounting records *that demonstrate where the payments of* [[          ]] *to* [*the customs broker*] *and* [[          ]] *to* [*Customs*] *are recorded*." Importer-Specific Suppl. Quest. (July 12, 2016) at 8, C.R. 37, ECF No. 38 at tab 9 (emphasis added).

Copies of cleared checks and invoices do not provide the information requested. That is, they do not show where the identified payments were recorded in the importer's books.

Third, plaintiff contends that the information Commerce requested relating to the payment term between Sunbeauty and its importer, *e.g.*, documents regarding retention, testing, and release of subject merchandise by U.S. authorities, was "irrelevant." Pl.'s Br. 20. For plaintiff, Commerce's request for this information resulted from the Department's "fail[ure] to fully understand the payment term agreed between Sunbeauty and [its importer]."[25] Pl.'s Br. 19-20. Commerce stated, however, that "[t]he Department did not misunderstand Sunbeauty's terms of sale when seeking this information, but, rather, sought this information to clarify the record and inform its understanding of the conditions of payment." Final I&D Memo at 12. Plaintiff, nonetheless, maintains that its failure to provide the information was harmless to Commerce's analysis, and the information it did provide, *i.e.*, emails between the importer and the broker, sufficed instead. Again, this argument is unconvincing. As noted above, Commerce designs its questionnaires to elicit information that it has determined it requires to perform its *bona fides* analysis, and Sunbeauty had the burden to respond with the requested information to create an adequate record. *See Nan Ya Plastics Corp.*, 810 F.3d at 1337-38.

Next, plaintiff argues that "Commerce's determination that the failure of Sunbeauty's [importer] to provide documentation undermined the *bona fide* nature of Sunbeauty's sales is

---

[25]       The payment term was [[                                                    ]]. Pl.'s Br. 20. Plaintiff apparently attributes Commerce's alleged "misunderstanding" of this term to the term's favorability to the buyer "because [[                                    ]] . . . ." Pl.'s Br. 20. Plaintiff goes on to explain that this term is "a cruel example of . . . how an experienced importer took advantage of an oversea[s] inexperience[d] exporter through a well-designed but unfair term[] of trade." Pl.'s Br. 20 (characterizing the payment term as a "business trick" and "unethical").

akin to making an adverse inference against a cooperating party due to a non-cooperating, non-party's failures." Pl.'s Br. 20. Plaintiff contends that, unlike cases in which this Court upheld the use of an adverse inference against a cooperating party, here, "Sunbeauty . . . obtain[ed] certain alternative documents from its [importer]," and "Sunbeauty has fully cooperated and has provided reliable documentation to allow Commerce to achieve its purpose." Pl.'s Br. 21.

This argument is unavailing. As an initial matter, Commerce did not draw an adverse inference against Sunbeauty, pursuant to 19 U.S.C. § 1677e, in the Final Rescission Determination. Rather, Commerce considered the discrepancies and deficiencies in Sunbeauty's responses as a relevant factor that tended to support its finding that Sunbeauty's sales were not *bona fide*, as it is required to do under the *bona fides* statute. *See* 19 U.S.C. § 1675(a)(2)(B)(iv)(VII) (Commerce "shall consider," *inter alia*, "any other factor [Commerce] determines to be relevant as to whether such sales are, or are not, likely to be typical of those the exporter or producer will make after completion of the review"). While standing alone these discrepancies and deficiencies may not suffice as substantial evidence that Sunbeauty's sales were not *bona fide*, Commerce properly considered them in light of other evidence on the record and found that they weighed in favor of a determination that the sales were not *bona fide. See Zhengzhou*, 37 CIT at __, Slip Op. 13-61 at 42 ("The court finds that the inconsistencies in Huachao's U.S. customer's responses to Commerce's questionnaires, and its failure to provide all of the information the Department requested, lends additional support to Commerce's finding of a non-bona fide sale under the 'totality of the circumstances' test.").

Finally, to the extent Commerce considered Sunbeauty's self-described "negligence" in preparing invoices as a factor bearing on the *bona fide* nature of its sales, the court finds no error. When Commerce pointed out a discrepancy between the  production date, [[                         ]]

on an invoice included in Sunbeauty's request for review, and information on the record stating

that its producer, Xiping, had [[                              ]] in that month, Sunbeauty stated that the

error was due to its own "negligence when preparing the invoice," specifically: "For the

convenience of its own work, [Sunbeauty] did not physically check the merchandise or

communicate with [Xiping]." Sunbeauty's Resp. Suppl. Sec. D Quest. (Sept. 1, 2016) at 2, C.R.

53, ECF 38 at tab 32. Although Sunbeauty downplays the significance of the discrepancy as a

"clerical error" that should not bear on the reliability of the information it supplied generally,

Commerce did not commit any error by considering Sunbeauty's admission of negligence,

particularly since plaintiff failed to bring the discrepancy in the documents to Commerce's

attention. *See* Final I&D Memo at 12 ("Sunbeauty . . . submitted these documents without

initially informing the Department that these discrepancies existed because '{f}or {the}

convenience of its own work, it did not physically check the merchandise or communicate with

{its producer}.'"). Moreover, it was not unreasonable for Commerce to conclude that the

discrepancy between the invoice bearing the erroneous production date and Xiping's

production  records may have had downstream consequences since, as Commerce noted and

Sunbeauty itself pointed out, the [[                              ]] would bear on "the shelf life of the honey

and its ultimate sale," which means that "the importer and, ultimately, the final U.S. customer

made purchasing decisions with respect to the sale of Sunbeauty's honey without complete and

accurate information." Final I&D Memo at 12-13. Accordingly, Commerce's consideration of

the discrepancies and deficiencies in Sunbeauty's questionnaire responses as a factor in its *bona*

*fides* analysis is sustained.

**CONCLUSION**

Commerce's conclusion that Sunbeauty's sales were not *bona fide*, based on an examination of the totality of the circumstances, is supported by the record. Therefore, Commerce's Final Rescission Determination is sustained. Judgment will be entered accordingly.


                                                        /s/ Richard K. Eaton
                                                        Richard K. Eaton, Judge

Dated:  September 6, 2018
          New York, New York